**OLDCASTLE MATERIALS, INC., Plaintiff,**

v.

**Roy ROHLIN, Phyllis Rohlin, Gregory A. Bruening, and Keith B. Bruening, Defendants.**

**No. C 04–4034–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Nov. 18, 2004.

Mark McCormick, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA, for Plaintiff.

Harold W. White, Fitzgibbons Bros. Law Office, Estherville, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING THE ROHLIN DEFENDANTS' MOTION TO BE DISCHARGED FROM FURTHER LIABILITY AND THE PLAINTIFF'S AND THE BRUENING DEFENDANTS' CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................765
   A. Factual Background ...........................................765
      1. The parties ............................................765
      2. The buy-sell agreement ................................765
      3. The Rohlins' attempts to sell their shares ............766
      4. Notice to the Zeiglers of the Bruenings' offer and the Zeiglers'
         response ...........................................768
      5. The Bruenings' offer to the Zeiglers .................769
      6. The Zeiglers' attempt to close the deal ..............769
   B. Procedural Background ........................................770
      1. Oldcastle's Complaint .................................770
      2. The Pending Motions ..................................771

II. LEGAL ANALYSIS ................................................772
   A. The Motions For Partial Summary Judgment ...................773
      1. Arguments of the parties .............................773
         a. The Bruenings' arguments ........................773
         b. Oldcastle's arguments ...........................774
      2. Applicable law .......................................775
         a. Standards for summary judgment ..................775
         b. Applicable contract law .........................776
            i. Specific performance ........................776
            ii. Contract formation .........................776
      3. Analysis .............................................778
         a. Was the March 22, 2004, letter an "offer"? .......778
         b. Did the Rohlins accept the offer? ................781
         c. Was the resulting agreement only an agreement to agree? .........781
         d. Are the Zeiglers entitled to specific performance? .................782

B.   The Rohlins' Motion For Discharge .....................................783
C.   Immediate Entry Of Judgment ......................................784

III.  CONCLUSION ...............................................................786

Somebody bought the majority shareholders' shares in the paving company at issue here, but who? The plaintiff, the assignee of the minority shareholders, contends that the minority shareholders bought the shares when they exercised their right of first refusal to match an offer from third-party buyers to buy the shares for approximately $9.3 million. The third-party buyers, on the other hand, contend that the minority shareholders exercised their right of first refusal "prematurely," while the third-party buyers were still verifying and negotiating a final purchase price, then failed to match the third-party buyers"' final offer" for $12.5 million. Consequently, the third-party buyers contend that they bought the shares in question. The majority shareholders concede that they sold the shares to somebody; they just cannot tell who. Confronted with what they contend are conflicting claims that could subject them to double liability, the majority shareholders assert that they should be discharged from liability upon delivering their shares to the court, and that the court should then determine, in an interpleader action between the claimants, who was the successful buyer and at what price. The plaintiff and the third-party buyers, however, contend that the issue of who bought the shares can be resolved on their cross-motions for summary judgment. The parties all assert that the resolution of this matter is urgent, or the paving company's value and very existence will be threatened. Therefore, this matter comes before the court for expedited resolution of the majority shareholders' motion for discharge from liability and the plaintiff's and third-party buyers' cross-motions for summary judgment.

# I. INTRODUCTION

## A. Factual Background

Despite their many differences, the plaintiff and the third-party buyers have stipulated to most of the facts giving rise to this litigation. The majority shareholders have not taken issue with the facts as stipulated by the other parties. Therefore, the court has drawn the following factual background from the parties' stipulation of facts and documents attached to that stipulation.

### 1. The parties

Rohlin Construction Company, Inc. (the Company), an asphalt contractor and sand and gravel producer, is a closely-held Iowa corporation with its principal place of business in Estherville, Iowa. The majority shareholders of the Company, and one set of defendants in this action, are Roy Rohlin and Phyllis Rohlin (the Rohlins). The Rohlins own 2,700 shares in the Company, or approximately 77.28 percent of the shares. The minority shareholders are James L. Zeigler and his wife, Joyce Zeigler (the Zeiglers). The Zeiglers own 794 shares, or approximately 22.72 percent of the shares. The Zeiglers have assigned their claims in this case to plaintiff Oldcastle Materials, Inc. (Oldcastle), which does business as Des Moines Asphalt & Paving Company. The third-party buyers referred to above, who are also defendants in this case, are Gregory A. Bruening and Keith B. Bruening (the Bruenings). The Bruenings are also involved in the paving business.

### 2. The buy-sell agreement

The original shareholders in the Company entered into a Buy and Sell Agreement

on August 15, 1974, concerning sales of the Company's shares. The Zeiglers became parties to the Buy and Sell Agreement by amendment dated June 9, 1978. The Buy and Sell Agreement provides, in pertinent part, as follows:

> During Rohlin's life he shall not, without consent of the other stockholder, sell, transfer, dispose of or encumber any shares of stock of the corporation now owned or hereafter acquired by him unless he shall have first offered to sell such stock as follows:
>
> a. He shall first offer in writing to sell such stock for sale to the corporation, the offer to be based on a price determined in accordance with the provisions of Article III hereof. If not accepted by the corporation within sixty (60) days such offer shall be deemed revoked.
>
> b. Any share or shares not purchased by the corporation within sixty (60) days after receipt of such offer shall be offered to the other stockholder, who shall have a right to purchase any or all of the stock offered for sale, at the same price and upon the same terms as it was offered to the corporation.
>
> c. If the offer is not accepted by the other stockholder within sixty (60) days after it is offered for sale, Rohlin shall have the right to sell it [sic] to any other person, but shall not sell it without giving the corporation and the remaining stockholder the right to purchase such stock at a price and upon the terms offered by such other person. In any such case Rohlin shall promptly furnish written evidence of the identity of such third party purchaser, as well as the price and terms of such offer, after which the corporation and the other stockholder shall have

> thirty (30) days to meet such offer, the corporation to have the first right to purchase. Any stock which is not purchased by the corporation or the other stockholder within such thirty (30) day period shall no longer be subject to the terms of this agreement.
>
> d. In the event any of the offers described in this article are accepted in whole or in part, payment of the purchase price shall be made in accordance with the provisions of Article IV hereof. Closing shall take place within 30 days after the offer to sell has been accepted.

Stipulated Appendix, A–1—A–2 (Buy and Sell Agreement, Art. I).

### 3. The Rohlins' attempts to sell their shares

Oldcastle and the Bruenings agree, and the Rohlins do not dispute, that, on January 11, 2001, the Rohlins offered to sell their stock to the Company for $7,243,454.40 pursuant to Article I(a) of the Buy and Sell Agreement. However, the Company did not accept that offer within sixty days, so that the offer was deemed revoked. On March 15, 2001, the Rohlins offered to sell their shares to the Zeiglers, on the same terms that the shares had been offered to the Company, pursuant to Article I(b) of the Buy and Sell Agreement. However, the Zeiglers likewise did not accept the offer within sixty days.

The Rohlins apparently then commenced a search for a third-party buyer pursuant to Article I(c). Eventually, on March 22, 2004, the Bruenings made what was denominated as an "Offer to Purchase" the Rohlins' stock. The Bruenings' Offer to Purchase included the following terms:

## PREAMBLE

The Buyer wishes to commence negotiating a definitive written agreement providing for the purchase of all of the issued and outstanding shares of the capital stock of the Company owned by Rohlin. To facilitate the negotiation of said Agreement, Buyer wishes to provide an offer to Rohlin which is predicated upon a cursory review of the books and records of the Company and an interview with Rohlin. An execution of any Agreement would be subject to the satisfactory completion of the Buyer's ongoing investigation of Company's business and compliance with a certain buy and sell agreement, dated August 15, 1974, and amended on or about June 9, 1978, by and between the Company, Rohlin, and James Zeigler. Based on the information currently known to the Buyer, the following offer is made to Rohlin:

\* \* \* \* \* \*

2. *Purchase Price.* The Purchase Price would be Nine Million Two Hundred Seventy–Three Thousand Six Hundred Dollars ($9,273,600.00) subject to the baseline due diligence confirmation and verification described below and would be paid in cash at the Closing.

The Purchase Price assumes that Company has and will continue to operate its business in the ordinary course and to refrain from any extraordinary transactions including the payment of bonuses, acquisition of machinery and equipment, sale of assets, execution of deferred compensation or golden parachute relationships with any director, stockholder, or officer of the Company and that the stockholders' equity as of March 31, 2004, is not less than that of March 31, 2003.

3. *Other Terms.* Rohlin and Company would make comprehensive representations and warranties to the Buyer, and would provide comprehensive covenants, indemnities, and other protections for the benefit of the Buyer. The consummation of the transaction by the Buyer would be subject to the satisfaction of various conditions, including: (a) Rohlin has good and valid title to the shares free and clear of any and all liens, encumbrances, and transfer restrictions; (b) Company has good and valid title to all of its assets free and clear of any liens except as noted in its financial statements as of March 31, 2004; (b) [sic] that there are no known areas of potential liability such as pending litigation, compliance with employment laws, taxing authorities, and other basic operations central to the Company's general purposes.

Stipulated Appendix at C–1—C–2 (Bruenings' Offer to Purchase, March 22, 2004).[1] The Bruenings' Offer to Purchase concluded with the following paragraph:

If you are in agreement with the foregoing, please sign and return one copy of this letter and we will instruct our legal counsel to begin preparing a definitive agreement that memorializes the offer made herein and, further, any other

1. Provisions of the Offer to Purchase not quoted above described the "basic transaction" as involving the purchase of all of the stock owned by Rohlin; imposed an "exclusive dealing" requirement, which barred the Rohlins from negotiating with any other buyer; provided for "access to business records" by the Bruenings; and imposed a burden of "confidentiality" on the Bruenings as to any of the Company's records, including a duty to return or destroy any such records upon the cessation of negotiations. Bruenings' Offer to Purchase, Stipulated Appendix at C–1—C–3.

points identified by the Buyer and Rohlin.

*Id.* at C–3. The Rohlins signed the Bruenings' Offer to Purchase on March 24, 2004, signifying their acceptance, and their attorney forwarded the signed copy to the Bruenings on March 25, 2004. *See id.* at D–3 (Bruenings' Offer to Purchase executed by the Rohlins) & F–1 (March 25, 2004, Letter).

### 4. *Notice to the Zeiglers of the Bruenings' offer and the Zeiglers' response*

On March 25, 2004, in accordance with Article I(c) of the Buy and Sell Agreement, an attorney for the Rohlins sent a certified letter to James L. Zeigler notifying him of the offer from the Bruenings. The body of the letter, in its entirety, stated the following:

> This letter is written to you both individually and as President of Rohlin Construction Company, Inc.
>
> You are a party to a Buy and Sell Agreement dated August 15, 1974, as amended June 9, 1978, which provides that Rohlin shall provide to you
>
>> written evidence of the identity of such third party purchaser, as well as the price and terms of such offer, after which the corporation and the other shareholder shall have thirty (30) days to meet such offer, the corporation to have the first right to purchase. Any stock which is not purchased by the corporation or the other stockholder within such thirty (30) day period shall no longer be subject to the terms of this agreement.
>
> Rohlins interpret the Buy and Sell Agreement to provide that the 30 days described above end 30 days after your receipt of this letter.

Stipulated Appendix at E–1—E–2 (the Rohlins' Notice to James Zeigler). On March 25, 2004, the Rohlins' attorney also provided the Bruenings with a copy of the Rohlins' notice to Mr. Zeigler. *Id.* at F–1 (the Rohlins' March 25, 2004, letter to the Bruenings).

On April 19, 2004, the Zeiglers informed the Rohlins, by letter, through their respective attorneys, that the Zeiglers would exercise their right of first refusal, as follows:

> This letter is in response to your letter of March 25, 2004 to James L. Zeigler informing him of the offer to Roy and Phyllis Rohlin to purchase their stock as set forth in the letter of March 22, 2004 from [the Bruenings] which the Rohlins accepted on March 24, 2004.
>
> Mr. and Mrs. Zeigler hereby exercise their right to purchase the stock in accordance with the terms of your letter of March 24 and the provisions of the Buy-Sell Agreement dated August 15, 1974, as amended June 9, 1978.
>
> Please let me know whether you want to prepare the initial draft of the stock purchase agreement or whether I should prepare the initial draft. We hope to close as soon as practical.

Stipulated Appendix at H–1 (April 19, 2004, Letter). The Zeiglers anticipated using funds from Oldcastle to finance their purchase of the Rohlins' shares, then selling all of the shares in the Company to Oldcastle. On April 13, 2004, the Zeiglers had reached an "understanding" with Oldcastle that Oldcastle would buy all of the shares of the Company from the Zeiglers for $12 million after the Zeiglers obtained control of all of the shares. *Id.* at G–1—G–4 (April 13, 2004, Letter of Intent). However, the Zeiglers never notified the Company or the Rohlins of the Zeiglers' intention to sell all of the stock in the Company to Oldcastle or its assignee.

On April 19, 2004, the Rohlins' attorney requested from the Zeiglers' attorney an initial draft of a Stock Purchase Agreement from the Zeiglers "since that would let us quickly determine if the Zieglers [sic] do indeed intend to match the outside offer with regard to purchase price, payment provisions, and its other terms." *Id.* at J–1 (April 19, 2004, E-mail). On April 20, 2004, the Rohlins' attorney notified the Bruenings' attorney by e-mail that "Ziegler [sic] intends to accept 'the Rohlin's [sic] offer referenced in your [my] letter of March 24, 2004.'" *Id.* at K–1 (April 20, 2004, E-mails).

### 5. The Bruenings' offer to the Zeiglers

In response to the notice that the Zeiglers were exercising their right of first refusal, the Bruenings made an offer to the Zeiglers on April 20, 2004, to purchase the Zeiglers' minority share of the Company's stock for $4 million, "conditioned upon Mr. Zeigler assigning all of his right, title, and interest in and to any buy-sell agreement by and between him, Roy Rohlin, and Rohlin Construction Company including the exercise of contract rights granted to Mr. Zeigler to purchase the interests of Roy and Phyllis Rohlin for approximately $9.3 million subject to 2004 fiscal year end results." *Id.* at L–1 (the Bruenings' April 20, 2004, Offer to Buy the Zeiglers' stock). The Bruenings' offer to the Zeiglers was revoked on April 23, 2004, when the Zeiglers did not respond.

### 6. The Zeiglers' attempt to close the deal

Between April 13 and April 20, 2004, attorneys for the Zeiglers and Oldcastle negotiated a letter of intent to record an agreement in principle for Oldcastle to purchase all of the outstanding stock of the Company from the Zeiglers for $12 million, contingent on the Zeiglers obtaining ownership of 100% of the stock. The Zeiglers and Oldcastle eventually prepared a draft Loan and Stock Purchase Agreement, which contemplated a loan from Oldcastle to the Zeiglers of up to $9,273,600 to be used to purchase the Rohlins' shares in the Company, followed by the Zeiglers sale to Oldcastle of all of the shares in the Company.

Meanwhile, the attorneys for the Rohlins and the Bruenings continued to exchange financial records of the Company. Based on the Company's March 31, 2004, financial information, the Bruenings advised the Rohlins that "[i]t is doubtful that the offered purchase price of approximately $9.3 million will decrease and, more than likely, [it] will increase." *Id.* at O–1 (April 22, 2004, Letter). However, the Zeiglers understood that equity in the Company had declined between $600,000 and $700,000 from the end of the preceding fiscal year, which the Zeiglers suggested should be reflected in a downward adjustment to the purchase price. *See id.* at P–2.

On April 23, 2004, the Bruenings' attorney notified the Rohlins and their attorney that "Greg Bruening and Keith Bruening, having reflected on the matter and in reliance upon information received, are prepared to adjust the price to a total sum equal to Twelve Million Five Hundred Thousand Dollars ($12,500,000.00) for all of the issued and outstanding shares of capital stock of Rohlin Construction Company, Inc. owned by Roy and Phyllis Rohlin...." *Id.* at R–1. The Bruenings anticipated a closing on their April 23, 2004, offer within thirty days. *Id.* The Rohlins' attorney then e-mailed the Zeiglers' attorney to inform him that the Bruenings had set a final purchase price of $12.5 million and that the Rohlins' attorney would prepare an agreement to reflect a $12.5 mil-

lion fixed price contract for the Zeiglers' purchase of the Rohlins' shares.

The Zeiglers' attorney notified Oldcastle's attorney of the Bruenings' purported "final offer" on April 24, 2004. It would probably be fair to say that the notice of the Bruenings"'final offer" caused some consternation to the Zeiglers and Oldcastle. In an e-mail on April 26, 2004, the Zeiglers' attorney informed the Rohlins' attorney that it was the Zeiglers' view that "[t]here has been an offer and an acceptance and I believe there is a contract at the price in the letter of March 24, or even more likely a discounted price to reflect the decline in stockholders' equity." *Id.* at V–1 (April 26, 2004, 7:55 a.m. e-mail). The Zeiglers also attempted to close the sale at the price on which they believed that they had an agreement. Specifically, on April 26, 2004, James Zeigler, accompanied by his attorney, a representative of Oldcastle, and Oldcastle's attorney, went to the offices of the Rohlins' attorney in an effort to close the transaction. Although the Rohlins' attorney and the Zeiglers' attorney reached agreement on the form of a stock purchase agreement for the Zeiglers to purchase the Rohlins' stock, they disagreed about the price. While the Rohlins' attorney maintained that the full purchase price would be $12.5 million, the Zeiglers' attorney asserted that the maximum purchase price was $9,273,600. Therefore, the Zeiglers' attorney tendered a check on behalf of the Zeiglers in that amount drawn on funds provided by Oldcastle. However, the Rohlins' attorney, acting on the Rohlins' behalf, refused the tender of the check and declined to close the transaction at the price asserted by the Zeiglers.

On April 28, 2004, the Zeiglers executed an assignment to Oldcastle of all of their claims against the Rohlins.[2] This litigation followed.

### B. Procedural Background

#### 1. Oldcastle's Complaint

Oldcastle filed its original Complaint in this matter on April 29, 2004, followed quickly by an Amended Complaint on May 3, 2004. Before any defendant responded, Oldcastle filed its Second Amended And Substituted Complaint on May 28, 2004. In that Second Amended And Substituted Complaint, Oldcastle asserts, first, a claim for "specific performance" against the Rohlins, which, if granted, would require the Rohlins to transfer their stock in the Company to Oldcastle in consideration of the payment of the purchase price stated in the March 22, 2004, Offer to Purchase. As its second claim, Oldcastle seeks injunctive relief restraining the Rohlins from any sale, transfer, disposition, or encumbrance of their stock in the Company, other than a conveyance to Oldcastle in consummation of the stock purchase provisions of the Buy and Sell Agreement, and further restraining the Rohlins, during the pendency of this action, from operating the Company other than in its ordinary course and from engaging in any extraordinary transactions. As its third claim, Oldcastle asserts tortious interference by the Bruenings with the Zeiglers' purchase of the Rohlins' stock, which interference Oldcastle alleges was accomplished through the Bruenings' letter of April 19, 2004, and other conduct subsequent to that letter.

On June 7, 2004, the Rohlins answered Oldcastle's Second Amended And Substituted Complaint, denying Oldcastle's claims against them, and asserting a counterclaim for interpleader. The Rohlins' counterclaim for interpleader asks the

---

**2.** No party has challenged the effectiveness of the Zeiglers' assignment of their claims to Oldcastle or disputed Oldcastle's right to bring and litigate the Zeiglers' claims in this lawsuit.

court to require Oldcastle to assert its claim for the Rohlins' shares against the Bruenings, instead of against the Rohlins. On June 18, 2004, Oldcastle filed a reply to the Rohlins' counterclaim, resisting the counterclaim for interpleader and renewing the prayer for relief in Oldcastle's Complaint. On July 2, 2004, the Bruenings also answered Oldcastle's Second Amended And Substituted Complaint, also denying Oldcastle's claims, asserting various affirmative defenses, and asserting a cross-claim against the Rohlins for specific performance of the sale of the Rohlins' shares pursuant to the Bruenings' April 23, 2004, Offer to Purchase the Company for $12.5 million. On July 7, 2004, the Rohlins filed an answer to the Bruenings' cross-claim in which the Rohlins also asserted a cross-claim of their own against the Bruenings. In their cross-claim, the Rohlins assert that the court must determine what offer the Zeiglers were required to meet and also determine what rights either Oldcastle or the Bruenings have to the Rohlins' shares. On July 15, 2004, the Bruenings filed a reply to the Rohlins' cross-claim, resisting the Rohlins' prayer for relief and instead requesting specific performance of the April 23, 2004, agreement between the Bruenings and the Rohlins for the purchase of the Rohlins' shares in the Company.

By leave of court, Oldcastle filed a Third Amended Complaint on September 14, 2004, adding a paragraph alleging that the Rohlins are barred by the doctrines of estoppel and waiver from challenging the Zeiglers' exercise of their purchase option under the Buy and Sell Agreement, because the Rohlins invoked the Zeiglers' right of first refusal in their March 25, 2004, notice to the Zeiglers, and because the Rohlins accepted the Zeiglers' April 19, 2004, exercise of the purchase option in accordance with the March 25, 2004 notice. The Rohlins filed an answer to the Third Amended Complaint on September 25, 2004, expressly denying Oldcastle's estoppel and waiver allegations.

### 2. The Pending Motions

On September 7, 2004, the Rohlins filed the first of the motions now pending before the court, the Rohlins' Motion To Discharge And Request For Evidentiary Hearing (docket no. 19). In their motion, the Rohlins request that the court hold an evidentiary hearing and thereafter grant the following relief: (1) an order pursuant to 28 U.S.C. § 2361 discharging them from further liability to Oldcastle or the Bruenings and permanently enjoining Oldcastle and the Bruenings from the further assertion of claims relating to the Rohlins' shares in the company except by interpleader and claims in this action; (2) an order requiring Oldcastle and the Bruenings to pay the Rohlins $9,263,600 plus interest, in such amounts and proportions as the court directs, until the court determines the amount of full payment for the Rohlins' shares; (3) an order directing the Rohlins to endorse in blank their shares in the Company and deliver them to the court, with the court to deliver the shares to the party, either Oldcastle or the Bruenings, that the court determines is entitled to purchase such shares; (4) an order directing the Bruenings, if they prevail, to pay the Rohlins the difference between the $9,263,600 interim payment and the $12.5 million purchase price offered by the Bruenings; and (5) an order determining the management and operation of the Company following the payment to the Rohlins and the deposit of their shares with the court. The Rohlins state in their motion that they are willing to continue their present management and employment duties with the Company, in exchange for their current wages and other benefits. Oldcastle resisted the Rohlins'

Motion To Discharge on September 16, 2004, asserting that this case is not amenable to interpleader, because the Rohlins are not exposed to double or multiple liability, where only one of the claimants to the Rohlins' shares can prevail. However, Oldcastle concurs in the need for expeditious determination of the specific performance claims in this case. Similarly, on September 20, 2004, the Bruenings resisted the Rohlins' Motion To Discharge, also asserting that this case is not a proper subject for interpleader, because only one claimant can prevail on its request for specific performance. However, the Bruenings acknowledge the need for continued operation of the Company during the pendency of the ownership issue; concur in the continuation of the Rohlins' employment with and management of the Company; and agree to the need for expeditious resolution of the specific performance claims. On September 25, 2004, the Rohlins filed a reply in support of their motion amplifying their arguments that this case involves a proper subject for interpleader and reiterating their request for discharge from liability.

By order dated October 1, 2004, the court set deadlines for anticipated motions for summary judgment on specific performance claims and set telephonic oral arguments for November 9, 2004, on the Rohlins' Motion To Discharge and the anticipated motions for summary judgment. In due course, on October 12, 2004, the Bruenings and Oldcastle, respectively, filed cross-motions for partial summary judgment, each seeking summary judgment on its claim for specific performance of a purported agreement between the movant and the Rohlins for the movant to purchase the Rohlins' shares. Oldcastle amended its motion for summary judgment on October 19, 2004. The Bruenings resisted Oldcastle's motion for summary judgment on October 22, 2004, and Oldcastle resisted the Bruenings' motion for summary judgment on October 25, 2004. Oldcastle and the Bruenings also filed replies on November 5, 2004.

The court held telephonic oral arguments on the motion to discharge and the motions for partial summary judgment as scheduled on November 9, 2004. At the hearing, Oldcastle was represented by Mark McCormick and Garth Adams of Belin, Lamson, McCormick, Zumbach, Flynn, P.C., in Des Moines, Iowa. The Rohlins were represented by Harold W. White of the Fitzgibbons Law Firm in Estherville, Iowa. The Bruenings were represented by James P. Craig and Brian J. Fagan of Moyer & Bergman, P.L.C., in Cedar Rapids, Iowa. The court was impressed with the high quality of the arguments, both written and oral, presented by the attorneys for all of the parties in this case. The pending motions are now fully submitted, and with the urging of the parties, the court now enters an expedited ruling on those motions.

## II. LEGAL ANALYSIS

A ruling granting summary judgment in favor of either Oldcastle or the Bruenings on a claim for specific performance would necessarily moot the Rohlins' motion for discharge and claim for interpleader. First, such a ruling would eliminate the possibility of "double or multiple liability" for the Rohlins. *See* Fed. R. Civ. P. 22 ("Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability."). Second, such a ruling would make it unnecessary for the court to enjoin the parties from instituting other proceedings affecting the Rohlins' shares or to discharge the Rohlins from further liability. *See* 28 U.S.C. § 2361 (in an interpleader action, "a dis-

trict court may ... enter its order restraining [the parties] from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court," and "may discharged the plaintiff from further liability"). On the other hand, if the court determines that the question of who purchased the Rohlins' shares is subject to genuine issues of material fact, it will be appropriate to consider the Rohlins' motion for interpleader, discharge, and determination of whether the Rohlins should continue their employment with and management of the Company while the issue of who purchased the Rohlins' shares is litigated. Therefore, the court will begin its legal analysis with the conflicting motions for partial summary judgment requiring specific performance of purported share purchase agreements to different buyers at different prices.

### A. The Motions For Partial Summary Judgment

#### 1. Arguments of the parties

##### a. The Bruenings' arguments

In support of their motion for partial summary judgment, and in resistance to Oldcastle's motion, the Bruenings argue that their March 22, 2004, offer contemplated an adjustment to the purchase price and that such an adjustment was consistent with Article I of the Buy and Sell Agreement. They contend, further, that the Rohlins' response to that offer followed the letter and spirit of the Buy and Sell Agreement, but that the Zeiglers' response satisfied neither. Specifically, the Bruenings contend that the Rohlins gave the Zeiglers all due notice of the Bruenings' offer, but that, in response, the Zeiglers negotiated the sale of the Company to Oldcastle to their best advantage, not to the best advantage of all of the shareholders, and did so without notice to the Roh-

lins. Such self-serving conduct, the Bruenings argue, cannot be rewarded by a court determining the equitable question of which party is entitled to specific performance. Thus, the Bruenings contend that equity favors specific performance of their purchase agreement. They argue that equity also favors specific performance of their agreement to purchase the Company for $12.5 million, rather than the Zeiglers' offer of only about $9.3 million, because their deal maximizes the benefit to the Rohlins, while leaving the Zeiglers in essentially the same position with the same interest in the Company that they enjoyed before the sale.

The Bruenings also argue that they are the only parties to reach an agreement as to all essential terms of a contract to purchase the Rohlins' shares. They argue that the Zeiglers exercised their right of first refusal "prematurely" on the basis of the Bruenings' March 22, 2004, provisional offer for approximately $9.3 million, but never made timely exercise of their right of first refusal to match the Bruenings' April 23, 2004, "final offer" of $12.5 million. Oldcastle's contention that any adjustment to the purchase price should have been a downward adjustment, the Bruenings contend, is without foundation in the Buy and Sell Agreement, because that Agreement does not grant a shareholder authority to negotiate a purchase price when matching a third party's offer. The Bruenings now describe their March 22, 2004, letter, as a "letter of intent" or "agreement to agree," not a complete offer. They also assert that the Zeiglers understood that the purchase price set forth in the Bruenings' March 22, 2004, letter was subject to ongoing due diligence, because the Zeiglers tendered a draft stock purchase agreement with the purchase price left blank and argued for a downward adjustment in the

purchase price based on the contingencies mentioned in the March 22, 2004, letter.

In a reply brief filed November 5, 2004, the Bruenings reiterate their contention that they have established a right to specific performance of their contract with the Rohlins, because the Zeiglers never exercised their right of first refusal as to the Bruenings' final offer for $12.5 million. The Bruenings argue that the March 22, 2004, letter made clear that the parties would formalize a more definitive agreement after the Bruenings completed due diligence. Therefore, the Bruenings contend that their right to consummate the contract with the Rohlins continued until the period for due diligence was completed and the terms of their offer were finalized. According to the Bruenings, the Rohlins' March 25, 2004, notice to the Zeiglers was part of an effort to be "fair and transparent" with the minority shareholders, but the Bruenings' March 22, 2004, letter did not, by itself, constitute an offer that the Zeiglers were entitled to match. Thus, the Bruenings contend that there was no "bidding war," but a process leading to a "final offer," which the Zeiglers never matched. The Bruenings contend that the "practical construction" placed on the letters and the Buy and Sell Agreement by the Bruenings and the Rohlins should result in specific performance of an agreement based on the Bruenings' $12.5 million offer. The Bruenings also contend that they have standing to assert equitable rights arising from the Buy and Sell Agreement, even if they are not parties to it. Finally, the Bruenings reiterate that the Zeiglers' inequitable conduct in failing to notify the Rohlins of their negotiations with Oldcastle should preclude an order granting Oldcastle's motion for specific performance.

### b. Oldcastle's arguments

In support of its motion for partial summary judgment, and in resistance to the Bruenings' motion, Oldcastle argues that the Bruenings made an offer to purchase the Rohlins' stock for a maximum of $9,273,600, and that the Zeiglers matched that offer. More specifically, Oldcastle argues that the Bruenings' March 22, 2004, offer set the price and terms for the sale and that the Zeiglers matched that offer within thirty days of notice of it from the Rohlins, as required by Article I(c) of the Buy and Sell Agreement. Oldcastle contends that the Zeiglers were not required to match the terms of the subsequent $12.5 million offer by the Bruenings, because neither the Rohlins nor the Bruenings had authority to "up the ante" once the Zeiglers matched the first offer. The Bruenings' subsequent offer, Oldcastle contends, was a new offer, not a memorialization or adjustment within the terms of the Bruenings' initial offer, but one that came too late, because it came after the first offer had already been accepted. Oldcastle asserts, further, that the Bruenings' first offer was neither ambiguous nor incomplete. Although the offer permitted "confirmation and verification" of the purchase price, and was based on certain assumptions, Oldcastle argues that it did not permit changes from the stated price of $9,273,600. Indeed, Oldcastle argues that any contingencies in the price, such as a decrease in the value of shareholder equity, would only have permitted a *reduction* in the purchase price that the Zeiglers were required to match, but that the Zeiglers were entitled to waive those contingencies as to purchase price, because they were conditions precedent for the buyer's sole benefit.

In the alternative, Oldcastle argues that the Rohlins offered to sell their stock to the Zeiglers for $9,273,600, and that the Zeiglers accepted that offer. In support of this contention, Oldcastle argues that, when the owner of property subject to a

right of first refusal gives notice to the rightholder of an acceptable third-party offer, that notice constitutes an "offer" to sell the property to the rightholder. Thus, when the Rohlins invoked the Zeiglers' right of first refusal in the March 25, 2004, notice of the Bruenings' offer, the Rohlins made an offer that the Zeiglers were entitled to and did accept. Furthermore, Oldcastle contends that the Rohlins' offer to sell the stock was, objectively, an offer to sell for at most $9,273,600. The circumstances of the offer, Oldcastle contends, including the Rohlins' reference to matching a "sale price of $9,273,600," objectively indicate that the timely tender of the stated sum would entitle the Zeiglers to the Rohlins' stock.

Oldcastle also argues that the Bruenings have no standing to complain about any alleged violation by the Zeiglers of the Buy and Sell Agreement, because the Bruenings are not parties to that agreement. Furthermore, they point out that the parties with such standing to complain, the Rohlins, have not done so. Oldcastle also argues that the Zeiglers did not engage in any inequitable conduct by negotiating with Oldcastle without notice to the Rohlins, because the Buy and Sell Agreement did not limit the source of funds that the Zeiglers could use to match an offer by a third-party buyer. Moreover, Oldcastle argues that the Zeiglers' sale of shares to Oldcastle was contingent upon the Zeiglers acquiring all of the shares in the Company. Thus, the Zeiglers did not encumber any shares of the Company without notice to the Rohlins.

Finally, Oldcastle argues that the Bruenings never had a contract with the Rohlins on which they could obtain specific performance nor have the Bruenings ever asserted that the Rohlins breached such a contract. Similarly, Oldcastle contends that the Rohlins have never contended that they had a contract with the Bruenings to sell their shares for $12.5 million.

In a reply brief filed November 5, 2004, Oldcastle argues that the Bruenings' response to Oldcastle's motion for partial summary judgment depends upon the proposition that the Bruenings' March 22, 2004, communication to the Rohlins, which the Bruenings themselves expressly labeled an "offer," was not, in fact, an offer, because the price stated was too "indefinite." Oldcastle points out that the purchase price was specified, subject only to the Bruenings' investigation of the Company's business, conduct of due diligence, and review of the Company's March 31, 2004, fiscal year end financial report. Such a contract, Oldcastle maintains, is sufficiently definite to be enforced. Oldcastle also maintains that the circumstances evidence no concern about a potential increase in the purchase price, only a potential reduction, owing to a decrease in shareholder equity. Oldcastle also points out that the Bruenings agree that the March 22, 2004, offer triggered the notice requirements of the Buy and Sell Agreement and that the Zeiglers' exercise of their right of first refusal gave them contract rights against the Rohlins. Finally, Oldcastle reiterates its conclusion that the Rohlins' March 25, 2004, letter to the Zeiglers, which notified them of the Bruenings' offer and invoked their right of first refusal, was, in and of itself, an "offer," which the Zeiglers were entitled to and did accept.

### 2. Applicable law

#### a. Standards for summary judgment

Rule 56 of the Federal Rules of Civil Procedure provides that either the claimant or the defending party may move for summary judgment in its favor on all or any part of a claim. See FED. R. CIV. P. 56(a) & (b). "The judgment sought shall be rendered forthwith if the pleadings, de-

positions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A case in which the issues involved are primarily questions of law, which the parties contend is the case here, "is particularly appropriate for summary judgment." *TeamBank, N.A. v. McClure*, 279 F.3d 614, 617 (8th Cir.2002) (citing *Adams v. Boy Scouts of America–Chickasaw Council*, 271 F.3d 769, 775 (8th Cir.2001)); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Shirley*, 96 F.3d 1108, 1111 (8th Cir.1996) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1315 (8th Cir.1996) (same).

### b. Applicable contract law

■ *i. Specific performance.* Oldcastle and the Bruenings each seek summary judgment on their respective claims for "specific performance" of a contract for the purchase of the Rohlins' shares in the Company. "Specific performance" is "[t]he remedy of requiring exact performance of a contract in the specific form in which it was made, or according to the precise terms agreed upon." BLACK'S LAW DICTIONARY 1138 (6th ed.1990). A party seeking "specific performance" of a contract must prove the terms of that contract by clear, satisfactory, and convincing evidence. *H & W Motor Express v. Christ*, 516 N.W.2d 912, 913 (Iowa Ct.App.1994).

"Specific performance of a contract is not a remedy which is available as a matter of right," but is instead available "in the sound discretion of the court." *Id.; accord Breitbach v. Christenson*, 541 N.W.2d 840, 843 (Iowa 1995) (as a matter of equity and discretion, specific perform-

ance "is not to be granted as a matter of right"); *Lange v. Lange*, 520 N.W.2d 113, 117 (Iowa 1994) ("specific performance" is a matter of equity resting within the court's sound discretion). Thus, "specific performance" is available, for example, when the contract involves property that is unique or that possesses special value. *Berryhill v. Hatt*, 428 N.W.2d 647, 658 (Iowa 1988); *Recker v. Gustafson*, 279 N.W.2d 744, 759 (Iowa 1979). Some time ago, the Iowa Supreme Court recognized that "[a] contract for sale of stock of a closely held corporation which is not procurable in any market is a proper subject for specific performance." *Lyon v. Willie*, 288 N.W.2d 884, 894 (Iowa 1980).

In this case, because the shares of the Company are closely-held, a contract for the purchase of the Rohlins' shares is a proper subject for specific performance. *Id.* Thus, the court turns to the question of whether Oldcastle or the Bruenings have proved by clear, satisfactory, and convincing evidence the terms of the contract that they seek to enforce. *H & W Motor Express*, 516 N.W.2d at 913. That determination necessarily depends upon whether a contract was formed at the purchase price asserted by the party in question, either $9,273,600, as Oldcastle contends, or $12.5 million, as the Bruenings contend.

■ *ii. Contract formation.* The Iowa Supreme Court has made clear that " '[a]ll contracts must contain mutual assent; mode of assent is termed offer and acceptance.' " *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) (quoting *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995)). The court recently explained the requirements of an "offer" as follows:

An offer is a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is

invited and will conclude it.' " [*Anderson*, 540 N.W.2d at 285] (quoting Restatement (Second) of Contracts § 24 (1979)). [Courts] determine whether an offer has been made objectively—not subjectively. *Id.* " 'The test for an offer is whether it induces a reasonable belief in the recipient that [the recipient] can, by accepting, bind the sender.' " *Id.* at 286 (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir.1995)).

In applying this objective test of intent, "we look for terms with precise meaning that provide certainty of performance." *Id.* "[I]f an offer is indefinite, there is no intent to be bound." *Id.* [The court] must determine whether the terms of [the purported offer] were "sufficiently definite" so as to constitute an offer. *See Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997). Such a determination is a question of law. *See id.*

> . . . . We noted in *Anderson* that
>
> "a lack of essential detail would negate such a belief [of intent], since the sender could not reasonably be expected to empower the recipient to bind him to a contract of unknown terms . . . . [T]he recipient of a hopelessly vague offer should know that it was not intended to be an offer that could be made legally enforceable by being accepted."

540 N.W.2d at 286 (quoting *Architectural Metal Sys.*, 58 F.3d at 1229).

*Heartland Express, Inc.*, 631 N.W.2d at 268–69; *accord Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997) (citing the same standards for contract formation and what constitutes an offer). Thus, the terms of a contract are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance. *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977); *accord Air Host Cedar Rapids v. Airport Comm'n*, 464 N.W.2d at 450, 453 (Iowa 1990) ("It is axiomatic that understandable or ascertainable terms are necessary ingredients for an enforceable contract."). Indicia that an offer was *not* intended may come from various aspects of the document in question, including the title of the document and any disclaimers of intent that the document constitute an offer. *Heartland Express, Inc.*, 631 N.W.2d at 269.

Similarly, "[a] binding contract requires an acceptance of an offer." *Id.* at 270 (citing *Magnusson*, 560 N.W.2d at 26). "An '[a]cceptance of an offer is a manifestation of assent to the terms thereof by the offeree in a manner invited or required by the offer.' " *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50). "Acceptance" of an "offer" does not make a contract, unless the "acceptance" is communicated to the offeror. *Id.*

An "offer and acceptance" resulting in a binding contract must be contrasted with a mere "agreement to agree." The Iowa Supreme Court has reiterated that "[a]n 'agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations.' " *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002) (quoting *Crowe–Thomas Consulting Group, Inc. v. Fresh Pak Candy Co.*, 494 N.W.2d 442, 444–45 (Iowa Ct.App.1992)); *Whalen v. Connelly*, 545 N.W.2d 284, 293 (Iowa 1996) ("A contract is however generally not found to exist when the parties agree to a contract on a basis to be settled in the future.") (citing *Air Host Cedar Rapids v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 453 (Iowa 1990)). For example, the Iowa Court of Appeals con-

cluded that a letter specifying that it was "a letter of interest only and is subject to the negotiation and execution of a definitive agreement" and inviting the recipients "to sign copies of the letter and turn this matter over to our respective attorneys for purposes of forming a definite contract" was "nothing more than an invitation to attempt to reach an agreement of sale," not an enforceable contract based on offer and acceptance. *Crowe–Thomas Consulting Group, Inc.*, 494 N.W.2d at 444–45. The court reached this conclusion not merely on the basis of the language of the letter, which the court observed might "ordinarily" be dispositive, but based on construction of the purported offer and acceptance "with all of the provisions of the contract and the accompanying letters which were made a part of the record." *Id.* at 445. Similarly, the Iowa Supreme Court concluded that only an unenforceable agreement to agree was presented where one sentence appearing to accord a full and unambiguous right was coupled with a second sentence making it clear that whatever was granted in the first sentence was subject to future negotiations and agreement by both parties. *Air Host Cedar Rapids,* 464 N.W.2d at 453.

### 3. Analysis

#### a. Was the March 22, 2004, letter an "offer"?

■ For Oldcastle to prevail on its motion for partial summary judgment, it must establish that the Bruenings' March 22, 2004, letter was an "offer" as a matter of law, which the Rohlins accepted. If the March 22, 2004, letter was not an "offer," then Oldcastle cannot prevail, and the court will turn to the Bruenings' contention that their April 23, 2004, letter was, instead, an "offer" that the Rohlins accepted.

The Bruenings now characterize the March 22, 2004, letter upon which Oldcastle relies as merely a "letter of intent" or "agreement to agree," which opened the door to negotiations toward a "final offer" of $12.5 million. Indeed, the Bruenings contend that everyone involved recognized that the March 22, 2004, letter did not set a "final" price, but left the final price open to negotiation after the Bruenings completed a due diligence investigation of the Company's fiscal year-end records. Oldcastle, however, argues that the letter was an offer to buy the Rohlins' shares for a maximum of $9,273,600. The court agrees with Oldcastle that the March 22, 2004, letter was, objectively, "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Heartland Express, Inc.,* 631 N.W.2d at 268 (internal quotation marks and citations omitted); *Magnusson,* 560 N.W.2d at 26.

First, contrary to the Bruenings' contentions, the March 22, 2004, letter was not "indefinite"; rather, as a matter of law, its terms "were 'sufficiently definite' so as to constitute an offer." *Id.* (quoting *Phipps,* 558 N.W.2d at 203, and noting that this determination is a question of law). There is no "'lack of essential detail'" that would negate a belief that an offer was intended. *Id.* (quoting *Anderson,* 540 N.W.2d at 286). The March 22, 2004, letter identifies a precise purchase price, $9,273,600, for a precise item, all of the Rohlins' shares. Stipulated Appendix at C–1—C–2 (Bruenings' Offer to Purchase, March 22, 2004, ¶¶ 2 & 3). Thus, it addresses the most essential details of the transaction for the purchase by the Bruenings of the Rohlins' shares.

The Bruenings contend that the purported offer was nevertheless "indefinite," because it was subject to due diligence and

other conditions. However, the court finds that the "due diligence" and other conditions do not create indefiniteness, because they are, as a matter of law, precisely stated "conditions precedent," that is, they are "'facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.'" *Gildea v. Kapenis,* 402 N.W.2d 457, 459 (Iowa Ct.App.1987) (quoting *Mosebach v. Blythe,* 282 N.W.2d 755, 759 (Iowa Ct.App. 1979)). In *Gildea,* the Iowa Court of Appeals applied precisely the same standards of "definiteness" applicable to other terms of a contract—whether the terms were too vague for the court to determine what the parties had agreed to—to a condition precedent—a "subject to financing clause"—to determine whether the contract was too indefinite to be enforceable. *See id.; and compare Severson,* 250 N.W.2d at 420 (considering whether contract terms are sufficiently definite that the court can determine with reasonable certainty the duty of each party and the conditions relative to performance). The court explained, further, that "[a] determination that a condition precedent exists does not ... depend on the particular form of words used, but rather depends upon the intention of the parties gathered from the language of the entire instrument." *Id.*

Here, the Bruenings hang their assertion that the purchase price in the March 22, 2004, letter was too indefinite to constitute an "offer" on the following: (1) the "Preamble" states, "An execution of any Agreement would be subject to the satisfactory completion of the Buyer's ongoing investigation of Company's business"; and (2) the "Purchase Price" paragraph states, "The Purchase Price would be Nine Million Two Hundred Seventy–Three Thousand Six Hundred Dollars ($9,273,600.00)

subject to the baseline due diligence confirmation and verification described below." Stipulated Appendix at C–1—C–2 (Bruenings' Offer to Purchase, March 22, 2004). The court finds that, as a matter of law, based on "the intention of the parties gathered from the language of the entire instrument," *see Gildea,* 402 N.W.2d at 459, neither "subject to" clause relied on by the Bruenings creates any indefiniteness about the purchase price at all, nor does either provision reasonably suggest that the parties intended to adjust or negotiate a "final" price. Rather, the precise purchase price was specifically stated, without approximation, equivocation, or express reservation of a right to negotiate; if the due diligence and other conditions precedent placed on the purchase price were not satisfied, the entire contract would simply have been null and void. *See Gildea,* 402 N.W.2d at 459–60. Similarly, these conditions precedent were for the sole benefit and protection of the Bruenings, not the Rohlins, as they protected the Bruenings from paying the specified purchase price if that price was not ultimately justified by the investigation of the Company's business, confirmed and verified by due diligence, or if other conditions adversely affecting the value of the Company occurred, such as loss in shareholder equity. Thus, while the Bruenings could have waived the conditions precedent, and continued with the transaction at the specified price, *see Dergo v. Kollias,* 567 N.W.2d 443, 444 (Iowa Ct.App.1997) ("Parties to a contract may waive a condition precedent to their performance of an obligation under the contract when the condition exists for their sole benefit and protection."), nothing about the conditions precedent warrants a conclusion that any party could raise the price after the Bruenings' offer had been accepted by the Rohlins based on the results of the Bruenings' due diligence

or other circumstances. The Rohlins, as the sellers, must be presumed to have been aware of the financial condition of the Company, and, indeed, they had previously offered to sell their shares to the Company or the minority shareholders, pursuant to the Buy and Sell Agreement, for a considerably lower price as a precondition to seeking a third-party buyer. Thus, there was no reason to protect the Rohlins from the results of due diligence or other investigation that might indicate that the Company was worth *more* than the offer price that the Rohlins had accepted.

Nor do any of the other "conditions precedent" create fatal indefiniteness here; instead, they complete the "essential details" of the transaction. Specifically, the March 22, 2004, letter conditions the offer on the Company continuing to operate its business in the ordinary course and to refrain from "extraordinary transactions," some of which were specified; "the stockholders' equity as of March 31, 2004, [being] not less than that of March 31, 2003," *see* Stipulated Appendix at C–2 (Bruenings' Offer to Purchase, March 22, 2004, ¶ 2); the Rohlins and the Company making "comprehensive representations and warranties," *see id.* at ¶ 3; and "satisfaction of various conditions," including the sellers' good title to shares, the Company's good title to assets, and the absence of known potential liabilities. *Id.* at ¶ 3.

■ The Bruenings nevertheless contend that the March 22, 2004, letter indicates that it is only an invitation to negotiate. This contention is based on the statement in the "Preamble" that the Bruenings "wish[ ] to commence negotiating a definitive written agreement providing for the purchase of all of the issued and outstanding shares of the capital stock of the Company owned by Rohlin," *id.* at C–1; the statement that the "offer" is "to facilitate negotiation of said Agree-

ment", *id.;* and the statement at the conclusion of the letter that, if the Rohlins signified their agreement, "we will instruct our legal counsel to begin preparing a definitive agreement that memorializes the offer made herein and, further, any other points identified by the Buyer and Rohlin." *Id.* at C–3. The court is not persuaded by this contention. The court acknowledges that, in *Air Host Cedar Rapids,* the Iowa Supreme Court concluded that only an unenforceable agreement to agree was presented where one sentence of the purported offer appeared to accord a full and unambiguous right, but a second sentence made clear that whatever was granted in the first sentence was subject to future negotiations and agreement by both parties. *Air Host Cedar Rapids,* 464 N.W.2d at 453. However, in contrast, in this case, it is language appearing to reserve matters for future negotiation and agreement that is belied by terms granting the Rohlins a full and unambiguous right to an enforceable agreement upon acceptance of the offer. Here, the terms stated in the March 22, 2004, letter are repeatedly denominated as constituting "an offer." *Cf. Heartland Express, Inc.,* 631 N.W.2d at 269 (indicia that an offer was *not* intended include the title of the document and disclaimers of intent to make an offer). Furthermore, unlike the letter at issue in *Crowe–Thomas Consulting Group,* this letter contains no express statement that it is "a letter of interest only" or "subject to the negotiation and execution of a definitive agreement," or that the matter would be turned over to the parties' attorneys "for purposes of forming a definite contract." *See Crowe–Thomas Consulting Group, Inc.,* 494 N.W.2d at 444–45. Rather, it expressly states that it "is intended to summarize the principal terms of an offer," *see* Stipulated Appendix at C–1 (opening paragraph of letter); that the Bruenings are making

"the following offer" to the Rohlins, *id.* at C–2 (final sentence of Preamble); and that any "definitive agreement" will "memorializ[e] the offer made herein," as well as any other, clearly not "principal," points identified by the parties. *Id.* at C–3 (concluding paragraph).

Because the March 22, 2004, letter contains all of the "principal"—*i.e.,* "essential"—terms of the offer, and is repeatedly characterized by the Bruenings themselves as an "offer," and there are no sufficient reservations of a right to negotiate essential terms further, the court concludes that the March 22, 2004, letter was sufficiently definite that the court can determine with reasonable certainty the duty of each party and the conditions relative to performance. *Severson,* 250 N.W.2d at 420; *accord Air Host Cedar Rapids,* 464 N.W.2d at 453 (an enforceable agreement requires understandable and ascertainable terms). To put it another way, it is clear that the March 22, 2004, letter was an "offer," because "it induces a reasonable belief in the recipient that [the recipient] can, by accepting, bind the sender." *Heartland Express, Inc.,* 631 N.W.2d at 268 (internal quotation marks and citations omitted). Furthermore, the Rohlins plainly understood the letter to be an offer, because they provided notice of it as an "offer" to the Zeiglers pursuant to the Buy and Sell Agreement, *see* Stipulated Appendix at F–1 (March 25, 2004, Letter from the Rohlins to the Zeiglers notifying the Zeiglers of the Bruenings' offer and invoking the provisions of the Buy and Sell Agreement providing the Zeiglers with a right to match the offer), and the Bruenings did not object to that notice as "premature" at the time it was made.

### b. Did the Rohlins accept the offer?

█ There would be no binding contract on the basis of the March 22, 2004, letter, however, unless the Rohlins also accepted the Bruenings' offer. *See id.* at 270. The Rohlins did accept the offer in the manner required by the Bruenings by returning a copy of the letter signed by both of them on March 24, 2004. *See id.* (noting that an acceptance must be " 'in a manner invited or required by the offer' " and must be communicated to the offeror) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50); *see also* Stipulated Appendix D–3 (Bruenings' Offer to Purchase executed by the Rohlins). Therefore, there was a binding contract between the Bruenings and the Rohlins for the sale and purchase of the Rohlins' shares in the Company for $9,273,600 subject to the Zeiglers' right of first refusal, pursuant to the Buy and Sell Agreement, to step into the shoes of the Bruenings to purchase the Company on the terms stated by the Bruenings in the March 22, 2004, letter.

### c. Was the resulting agreement only an agreement to agree?

The Bruenings contend that, notwithstanding the Rohlins' acceptance of their offer in the March 22, 2004, letter, the result was only an "agreement to agree," not a binding contract for the sale and purchase of the Rohlins' shares. The Bruenings are correct that "[a]n 'agreement to agree to enter into a contract is of no effect *unless* all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations.' " *Scott,* 653 N.W.2d at 562 (quoting *Crowe–Thomas Consulting Group, Inc.,* 494 N.W.2d at 444–45) (emphasis added). However, the court found above that, as a matter of law, the March 22, 2004, letter *was* complete in all of its terms. Thus, the March 22, 2004, offer and the Rohlins' March 25, 2004, acceptance did not result in just an agreement to a contract on a basis to be settled in the future. *Air Host Cedar Rapids,* 464 N.W.2d at 453.

### d. Are the Zeiglers entitled to specific performance?

■ There is no dispute that, on April 19, 2004, the Zeiglers informed the Rohlins, by letter, through their respective attorneys, that the Zeiglers would exercise their right of first refusal. Stipulated Appendix at H–1 (April 19, 2004, Letter). The Bruenings contend only that the Zeiglers exercised their right of first refusal "prematurely," because there was then no "offer" on the table, not that the Zeiglers' exercise of their right was otherwise ineffective because it did not comply with the Buy and Sell Agreement. Because the court concludes that the Bruenings' March 22, 2004, letter constituted an offer, which the Rohlins had accepted, the Zeiglers did not exercise their right of first refusal prematurely, but in a timely manner, such that they stepped into the Bruenings' shoes as the buyers of the Rohlins' shares. *See* Stipulated Appendix, A–1–A–2 (Buy and Sell Agreement, Art. I) (the minority shareholder is entitled to exercise a right of first refusal to purchase shares in the Company on the same terms offered by a third-party buyer); *id.* at C–2 (the Bruenings' Offer to Purchase, March 22, 2004, ¶ 3) (the Bruenings' offer was conditioned upon compliance with the Buy and Sell Agreement).

The Bruenings also contend that the Zeiglers understood that whatever they were accepting was not a complete contract, because they recognized that the purchase price was still subject to investigation, confirmation, and negotiation, and they continued to press for a discount in the purchase price. This argument is also unavailing, because, by exercising their right of first refusal, the Zeiglers became the beneficiaries of the conditions precedent in the March 22, 2004, offer. As explained above, these conditions precedent were for the sole benefit and protection of the *buyers*, now the Zeiglers rather than the Bruenings, as they protected the buyers from paying the specified purchase price if that price was not ultimately justified by the investigation of the Company's business, confirmed and verified by due diligence, or if other conditions adversely affecting the value of the Company occurred. The Zeiglers were aware that one condition precedent, that "the stockholders' equity as of March 31, 2004, is not less than that of March 31, 2003," *see* Stipulated Appendix at C–2 (Bruenings' Offer to Purchase, March 22, 2004, ¶ 2), had not been met, because the fiscal year end reports for March 2004 showed that the shareholders' equity had, in fact, declined over the preceding year. Thus, the Zeiglers could reasonably have considered that the purchase price should be discounted. Ultimately, however, the Zeiglers had the right to, and did, waive this condition precedent, and continued with the transaction at the price specified in the Bruenings' March 22, 2004, offer, by tendering to the Rohlins' attorney the full purchase price at the attempted closing on April 26, 2004. *See Dergo,* 567 N.W.2d at 444 ("Parties to a contract may waive a condition precedent to their performance of an obligation under the contract when the condition exists for their sole benefit and protection.").

Next, the Bruenings contend that the Zeiglers are not entitled to specific performance, because the Zeiglers acted inequitably by not notifying the Rohlins that they were obtaining financing from Oldcastle to purchase the Rohlins' shares that was contingent upon the Zeiglers selling all of the shares in the Company to Oldcastle. The Bruenings are correct that specific performance is not a matter of right, but is instead an equitable remedy available in the discretion of the court. *Breitbach,* 541 N.W.2d at 843; *Lange,* 520 N.W.2d at 117; *H & W Motor Express,* 516 N.W.2d at 913. However, the court

finds no equitable impediment to awarding specific performance to the Zeiglers. The court is not persuaded that the Zeiglers had any obligation to notify the Rohlins, who had already agreed to sell their shares for a certain sum, that they were trying to obtain financing to exercise their right of first refusal. The Buy and Sell Agreement put the ball entirely in the Zeiglers' court at that point to determine if, how, and under what conditions they wished to exercise their right of first refusal. The Buy and Sell Agreement is plainly designed to protect the interests of a *remaining* shareholder when the other shareholder has agreed to sell its shares to a third party, because it grants rights to the *remaining* shareholder and imposes obligations on the *selling* shareholder. *See* Stipulated Appendix at A–1—A–3 (Buy and Sell Agreement, Art. I) (provisions for the sale of shares by either the Rohlins or the minority shareholder, *inter alia*, requiring that the remaining shareholder be given a right of first refusal); *id.* at B–1 (Amendment to Buy and Sell Agreement) (making provisions concerning the sale of shares by the minority shareholder applicable to the Zeiglers). Moreover, there is simply no "inequity" in ordering the specific performance of a contract for the sale of the Rohlins' shares for $9,273,600 based on the fact that the Bruenings were willing to offer a higher price of $12.5 million, when the Rohlins had *already* entered into a binding agreement to sell the shares for $9,273,600. On the other hand, it would be inequitable to deprive the Zeiglers of the benefit to which they were entitled pursuant to their right of first refusal under the Buy and Sell Agreement to purchase the Rohlins' shares on the same terms as the Bruenings had offered and the Rohlins had accepted.

Finally, the other requirements for specific performance have been met. First, the sale of shares in a closely-held corporation like the Company are a proper subject for specific performance, because they are unique property. *Berryhill,* 428 N.W.2d at 658 (specific performance is available for unique property); *Lyon,* 288 N.W.2d at 894 ("A contract for sale of stock of a closely held corporation with is not procurable in any market is a proper subject for specific performance."). Because the court finds that the terms of the sale of the Rohlins' shares pursuant to the Bruenings' March 22, 2004, offer, were clear and complete, the court also finds that the Zeiglers have, as a matter of law, established the terms of the contract for the sale of the Rohlins' shares by clear, satisfactory, and convincing evidence. *H & W Motor Express,* 516 N.W.2d at 913 (a party seeking specific performance of a contract must prove the terms of that contract by clear, satisfactory, and convincing evidence).

Therefore, Oldcastle's motion for partial summary judgment for specific performance of a contract for the sale of the Rohlins' shares for $9,273,600 shall be granted. In contrast, the Bruenings' motion for partial summary judgment for specific performance of a purported later agreement for the Bruenings to purchase the Rohlins' shares for $12.5 million must be denied, where the court will enforce the earlier agreement resulting in a sale to the Zeiglers.

### B. The Rohlins' Motion For Discharge

█ As explained above, on September 7, 2004, the Rohlins filed a Motion To Discharge And Request For Evidentiary Hearing, seeking the following relief: (1) an order pursuant to 28 U.S.C. § 2361 discharging them from further liability to Oldcastle or the Bruenings and permanently enjoining Oldcastle and the Bruenings from the further assertion of claims relating to the Rohlins' shares in the Com-

pany except by interpleader and the claims in this action; (2) an order requiring Oldcastle and the Bruenings to pay the Rohlins $9,263,600 plus interest, in such amounts and proportions as the court directs, until the court determines the amount of full payment for the Rohlins' shares; (3) an order directing the Rohlins to endorse in blank their shares in the Company and deliver them to the court, with the court to deliver the shares to the party, either Oldcastle or the Bruenings, that the court determines is entitled to purchase such shares; (4) an order directing the Bruenings, if they prevail, to pay the Rohlins the difference between the $9,263,600 interim payment and the $12.5 million purchase price offered by the Bruenings; and (5) an order determining the management and operation of the Company following the payment to the Rohlins and the deposit of their shares with the court. The court stated above that a ruling granting Oldcastle's motion for partial summary judgment for specific performance would necessarily moot the Rohlins' motion, and the court now reaffirms that conclusion. Therefore, the Rohlins' Motion To Discharge will be denied as moot.

### C. Immediate Entry Of Judgment

■ Although no party requested that the court do so, the court will consider *sua sponte* whether or not to enter judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure on the conflicting claims for specific performance and other claims necessarily disposed of by the court's ruling that Oldcastle is entitled to summary judgment on its specific performance claim. *See, e.g., Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 699 (Fed.Cir. 2001) (the district court has the authority *sua sponte* to enter judgment under Rule 54(b), because whether to allow an interim appeal is best decided by the district court,

and Rule 54(b) allows the district court to control its docket); *State Treasurer of Michigan v. Barry*, 168 F.3d 8, 14 (11th Cir.1999) (the district court, *sua sponte* or on motion, could have certified pursuant to Rule 54(b) that there was no reason for delay and directed the entry of final judgment on the plaintiff's complaint and the defendant's counterclaim for tortious interference). Such a course is appropriate, because the only claim not expressly resolved or necessarily mooted by this court's ruling that Oldcastle is entitled to specific performance of its contract to purchase the Rohlins' shares is Oldcastle's third claim alleging tortious interference by the Bruenings with the Zeiglers' purchase of the Rohlins' stock, arising from the Bruenings' letter of April 19, 2004, and other conduct subsequent to that letter.

Rule 54(b) provides as follows:

**(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FED. R. CIV. P. 54(b). The Eighth Circuit Court of Appeals has explained,

> Generally, an order that adjudicates less than all claims involved in an action does not constitute a final appealable order. *See* Fed.R.Civ.P. 54(b). Rule 54(b) provides an exception where the district court makes an "express determination" that there is no just reason to delay entering judgment despite the fact that all the [*988] claims in the action have not been resolved. Where the district court's intent to enter a partial final judgment under Rule 54(b) is clear, the order is considered appealable. *See Kocher v. Dow Chem. Co.*, 132 F.3d 1225, 1228–29 (8th Cir.1997).

*Speer v. City of Wynne, Ark.*, 276 F.3d 980, 987–88 (8th Cir.2002). "The sole purpose of a Rule 54(b) order is to provide an opportunity to appeal claims affecting some but not all of the parties or some but not all of the issues." *Orion Fin. of S.D. v. American Foods Group*, 201 F.3d 1047, 1049 (8th Cir.2000).

Turning to the express requirements of Rule 54(b), the Eighth Circuit Court of Appeals has also explained that, in determining that there is "no just reason for delay," the district court "must consider both the equities of the situation and 'judicial administrative interests,' particularly the interest in preventing piecemeal appeals." *Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir.1993) (citing *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)). The court's weighing of equities is given deferential review for abuse of discretion, although the court's analysis of appellate administrative interests is given closer scrutiny. *Id.* Although review is for abuse of discretion, "[a] Rule 54(b) determination should not be made routinely; it is only the 'special case' that warrants an immediate appeal from a partial resolution of the lawsuit." *Id.*

The better course is for the district court to elaborate on the reasons for its conclusion that the case is a "special" one deserving Rule 54(b) certification. *See Hardie v. Cotter & Co.*, 819 F.2d 181, 182 (8th Cir.1987) (declining to say that an order that does not elaborate on the reasons for Rule 54(b) certification would never be sufficient to withstand attack, but reversing an order that failed to do so, where the appellate court could find nothing in the record justifying the certification or suggesting that the interests of the parties would be furthered by such a certification); *Bullock v. Baptist Mem. Hosp.*, 817 F.2d 58, 59 (8th Cir.1987) ("We take the view ... that Rule 54(b) certifications must, either in express words or by unmistakably clear implication, contain the findings specifically required by the rule. Only in this way can the final-judgment rule, which is the cornerstone of appellate jurisdiction, be defended against piecemeal encroachment."); *Mooney v. Frierdich*, 784 F.2d 875, 876 (8th Cir.1986) (noting that failure to state findings specified in the rule hampers appellate review). Therefore, the court will do more than simply recite the talismanic words of the Rule. *See Quinn v. City of Boston*, 325 F.3d 18, 26 (1st Cir.2003) (observing that, in the First Circuit, "rote recital of Rule 54(b)'s talismanic phrase is not enough, in and of itself, to trump the wonted application of the final judgment rule").

Here, the court finds that there is no just reason for delay and the court, therefore, will expressly direct entry of judgment. *See* FED. R. CIV. P. 54(b) (requiring this determination and direction). This is, in the court's view, a "special case" warranting immediate appeal, if any disappointed party so desires. *Interstate Power Co.*, 992 F.2d at 807. First, the equities

of the situation weigh heavily in favor of immediate entry of judgment. *Id.* (the district court "must consider both the equities of the situation and 'judicial administrative interests,' particularly the interest in preventing piecemeal appeals") (citations omitted). The parties agree, and the court finds, that expeditious disposition of the conflicting claims for specific performance would not only benefit the parties, but would help preserve the Company as a viable business. If the parties must wait to appeal this ruling until after disposition of Oldcastle's claim for tortious interference, there might be little value left in the shares they have been fighting over. Similarly, the financial condition of the parties could change, so that they might not be able to consummate the transactions as currently formulated. Second, although there are "judicial administrative interests" to be considered, including the interest in preventing piecemeal appeals, *see id.*, and Oldcastle's claim for tortious interference may be factually overlapping with the underlying issue of who bought the Rohlins' shares, disposition of the tortious interference claim does not, in any way, depend upon or impact upon the claims for specific performance. To put it another way, the resolved and unresolved claims are legally distinct and involve distinct remedies, even if they are not factually distinct. Thus, judicial administrative interests in preventing piecemeal appeals do not weigh against certification of the majority of the claims in this action for entry of judgment and immediate appeal.

Therefore, the court will direct the entry of judgment pursuant to Rule 54(b) on Oldcastle's claim for specific performance and all other claims disposed of or mooted by this ruling.

### III. CONCLUSION

The court concludes that, as a matter of law, the Bruenings' March 22, 2004, letter was an "offer," which the Rohlins duly accepted, and as to which the Zeiglers duly exercised their right of first refusal to purchase the Rohlins' shares upon the same terms offered by the Bruenings. Thus, it is Oldcastle, not the Bruenings, who is entitled to summary judgment on its claim for specific performance. This decision resolves Oldcastle's first claim, for specific performance, and its second claim, for injunctive relief restraining the Rohlins from transferring their stock to anyone other than Oldcastle. Conversely, this decision requires denial of the Bruenings' motion for partial summary judgment on its cross-claim for specific performance of a conflicting purchase agreement with the Rohlins, as well as the Rohlins' cross- and counterclaims for determination of the buyer of the Rohlins' shares. Under the circumstances, the court finds that judgment should enter pursuant to Rule 54(b) on these claims, because there is no just reason for delay.

THEREFORE,

1. The Rohlins' September 7, 2004, Motion To Discharge And Request For Evidentiary Hearing (docket no. 19) is **denied as moot.**

2. The Bruenings' October 12, 2004, Motion For Summary Judgment (docket no. 33) is **denied.**

3. Oldcastle's October 12, 2004, Motion For Partial Summary Judgment (docket no. 34) is **granted**.

4. Pursuant to Rule 54(b), and the court's finding that there is no just reason for delay, **judgment shall enter** on the following claims as follows:

   a. Judgment shall enter **in favor of Oldcastle and against the defendants** on Oldcastle's first claim for specific performance. The court **orders and decrees the specific performance** of the agreement for the purchase by Oldcastle of the Rohlins' shares in Rohlin Construction Company, Inc., for the sum of

$9,273,600.00 pursuant to the March 22, 2004, offer by the Bruenings, as accepted by the Rohlins on March 24, 2004, the Zeiglers right of first refusal under the Buy and Sell Agreement of August 15, 1974, as amended June 9, 1978, and the Zeiglers' assignment to Oldcastle of such rights.

b. Oldcastle's second claim for injunctive relief is **dismissed as moot**.

c. The Rohlins' counterclaim for interpleader is **dismissed as moot**.

d. The Rohlins' cross-claim is **dismissed as moot**.

e. Judgment shall enter **against the Bruenings** on the Bruenings' cross-claim against the Rohlins for specific performance.

5. This matter will proceed in this court only on Oldcastle's third claim, which is a claim for tortious interference against the Bruenings.

**IT IS SO ORDERED.**