**Dudley PHIPPS, Appellant,**

v.

**IASD HEALTH SERVICES CORP. d/b/a Blue Cross and Blue Shield of Iowa, Appellee.**

**No. 95–1838.**

Supreme Court of Iowa.

Jan. 22, 1997.

David S. Wiggins of Wiggins, Anderson & Conger, P.C., West Des Moines, for appellant.

Elizabeth Gregg Kennedy and Michael J. Eason of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, ANDREASEN, and TERNUS, JJ.

ANDREASEN, Justice.

Defendant IASD Health Services Corp. (Blue Cross) fired employee Dudley Phipps for unacceptable job performance. Phipps brought suit against Blue Cross, alleging wrongful discharge, breach of contract, breach of implied contract or implied covenant of good faith and fair dealing, and violation of the Iowa Wage Payment Collection Law. The district court granted summary judgment in defendant's favor. We affirm.

## I. *Background Facts and Proceedings.*

Phipps was hired by Blue Cross in 1986 as a claims examiner. At that time, he read and signed a statement acknowledging that his employment could be terminated with or without cause and with or without notice at any time. As an employee, Phipps received an employee handbook (handbook). The first page of the handbook provided the following language, in boldface type:

> This Employment Guide has been prepared as a guide and reference for employees of IASD Health Services Corp. The Plan [meaning IASD] reserves the right to make changes to any corporate policy, procedure or program at any time without notice. In no event shall this handbook be considered as creating a contractual relationship between the employee and the Plan. All employees serve at the will of the Plan and either the Plan or the employee may terminate employment at any time.

In 1987, Phipps was promoted to a supervisory position. Because he was a supervisor, Phipps received another handbook, the Human Resources Administration Manual (manual). In addition to the above disclaimer, both the handbook and the manual contained numerous other disclaimers stating that employment relationships were at-will. Throughout his employment, Phipps understood that the policy of Blue Cross was to employ at-will.

The handbook and manual explained the guidelines and procedures for disciplining and terminating employees, referred to as "step discipline." This process includes such steps as verbal counseling, written counseling, performance probation, follow-up counseling or probation, and termination. However, the manual states that in certain situations those procedures will not be followed, and the employee may be subject to immediate termination without notice. Dana Rosendahl, Phipps' supervisor, stated that supervisors are expected to use the step discipline procedures in normal situations, but that the procedures are merely guidelines and are not appropriate in every case.

On March 6, 1992, Phipps received a disciplinary warning (oral counseling) from his

supervisor for insubordination and disruptive behavior. On June 15, 1993, he was again formally disciplined by Rosendahl and placed on sixty-day written counseling for insubordination, dishonesty, resisting feedback, and violation of company policy. On November 3, Phipps was placed on sixty-day performance probation for additional incidents of insubordination, dishonesty, resisting feedback, and failure to follow company policy. This followed four specific incidents, the last one occurring on October 20. The probation ended on January 3, 1994.

The probation had the effect of excluding Phipps from receiving his gainsharing payments. "Gainsharing" is an opportunity for employees of Blue Cross to receive money based on the performance of the company and is considered part of an employee's compensation. Ronald Hatfield, a manager in benefit administration, described gainsharing not as a bonus, but as "a sharing of the excess revenue that we have in a prior year." To qualify for gainsharing, an employee must not be on probation on December 31 and must have been employed for at least one year. Phipps' supervisors knew when they picked November 3 as the beginning date of the probation that Phipps would lose his gainsharing. Phipps did not appeal his probation.

On February 10, 1994, Phipps filed a grievance to question the effective date of his probation and its effect of disqualifying him from eligibility for 1993 gainsharing. He claimed that the normal procedures at Blue Cross were not followed in handling his discipline. Phipps also contends that after challenging the effective date of the probation, the work environment became hostile toward him. Blue Cross discharged Phipps from its employment on March 31, citing unacceptable performance.

On June 22, Phipps filed a petition in Iowa district court with claims for wrongful discharge, breach of contract, breach of implied contract or implied covenant of good faith and fair dealing, and violation of the Iowa Wage Payment Collection Law, Iowa Code chapter 91A (1993). Blue Cross filed a motion for summary judgment on August 9, 1995, which was resisted by Phipps. The district court granted summary judgment in favor of Blue Cross. Phipps filed timely notice of appeal.

On appeal, Phipps argues that (1) he has a valid claim for violation of the Iowa Wage Payment Collection Law, (2) his situation falls within the public policy exception to the employee at-will doctrine, (3) he has a valid breach of contract claim, (4) we should recognize a claim for breach of good faith and fair dealing, and (5) he should be allowed to pursue his emotional distress damages.

## II. *Scope of Review.*

Summary judgment is appropriate under Iowa Rule of Civil Procedure 237 only when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Iowa R. Civ. P. 237(c); *City of West Branch v. Miller*, 546 N.W.2d 598, 600 (Iowa 1996). In ruling upon the motion, the court considers the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *City of West Branch*, 546 N.W.2d at 600. We examine the record before the district court to decide whether a genuine issue of material fact exists and whether the court correctly applied the law. *Gerst v. Marshall*, 549 N.W.2d 810, 811–12 (Iowa 1996). In doing so, we view the facts in the light most favorable to the party opposing the motion for summary judgment. *Id.*

## III. *Iowa Wage Payment Collection Law.*

Phipps' first argument is that his gainshare is a "wage" under Iowa Code section 91A and that he has a valid claim for violation of the Iowa Wage Payment Collection Law. In its ruling on the motion for summary judgment, the district court held that Phipps' claim for gainsharing payments concerned future eligibility for money, not wages. We believe the gainshare is a wage, but find no violation of the law.

■ The purpose of the Iowa Wage Payment Collection Law is to facilitate the collection of wages owed to employees. *Williams v. Davenport Communications Ltd. Partnership*, 438 N.W.2d 855, 857 (Iowa App.1989); *see Davis v. Ottumwa Young*

*Men's Christian Ass'n,* 438 N.W.2d 10, 12 (Iowa 1989). An employer must pay all wages due its employees. Iowa Code § 91A.3(1). "Wages" is defined in Iowa Code section 91A.2(7), which provides in relevant part:

> "*Wages*" means compensation owed by an employer for:
>
> a. Labor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation.
>
> . . . .
>
> c. Any payments to the employee or to a fund for the benefit of the employee, including but not limited to payments for medical, health, hospital, welfare, pension, or profit-sharing, which are due an employee under an agreement with the employer or under a policy of the employer. . . .

If an employer fails to pay an employee wages, the employer is subject to liability for unpaid wages or expenses, court costs, and attorney fees. Iowa Code § 91A.8; *Dallenbach v. MAPCO Gas Prods., Inc.,* 459 N.W.2d 483, 489 (Iowa 1990). If the employer's conduct is intentional, liquidated damages are also recoverable. Iowa Code § 91A.8; *Dallenbach,* 459 N.W.2d at 489.

■ It is clear that Blue Cross's gainsharing meets the broad definition of "wages." Blue Cross concedes that gainsharing is considered part of its employees' compensation. The compensation in question is Phipps' 1993 gainshare payment. It does not make sense to argue that this involves future wages. The 1993 gainshare payment is earned in 1993. Further, gainsharing is described as a sharing of the excess revenue from the prior year. Just because the gainshare payments were not made until 1994 does not mean they were not earned in 1993. In fact, it was impossible for Blue Cross to determine the amount of the excess revenue until 1993 had ended.

■ Even though gainsharing is a "wage," Phipps still has no claim for nonpayment under chapter 91A. Under Iowa Code section 91A.2(7), Blue Cross did not "owe" Phipps the gainsharing payment because he was on probation on December 31, 1993, a violation of one of Blue Cross's established criteria. Further, the starting date of the probation was not contrary to any company policy. Phipps claims that the probation should have begun immediately following his last specific incident of misconduct on October 20. Neither the handbook nor the manual mentions a timeline for imposing a sanction such as probation. Blue Cross legitimately decided that denying Phipps his gainsharing, by starting the probation on November 3, was an appropriate penalty. This decision was based on Phipps' past job performance and misconduct and the fact that he was on counseling or probation for one-third of 1993.

### IV. *Public Policy Exception to Employment At–Will.*

Next, Phipps argues that the district court erred in determining that his situation does not come within the articulated public policy exception to the employment at-will doctrine. Specifically, Phipps claims he was terminated for making an inquiry, under Iowa Code chapter 91A, into why the gainsharing was not available to him. We do not agree.

■ Employment relationships in Iowa are presumed to be at-will. *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 281 (Iowa 1995). In the absence of a valid employment contract, an employer may discharge an employee at any time, for any reason, or no reason at all. *Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 219 (Iowa 1996); *Anderson,* 540 N.W.2d at 281. We have recognized only two narrow exceptions to this general rule: (1) where the discharge clearly violates a "well-recognized and defined public policy of the state"; and (2) where a unilateral contract is created by an employer's handbook or policy manual. *Huegerich,* 547 N.W.2d at 220 (quoting *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560 (Iowa 1988)).

■ The public policy exception is based on the theory that employers should not be allowed to fire employees for reasons that violate public policy. *Borschel v. City of Perry,* 512 N.W.2d 565, 567 (Iowa 1994).

Such policies may be expressed in the constitution and the statutes of Iowa. *Id.* An employer may be subject to tort liability for the retaliatory discharge of an employee when the discharge violates a "well-recognized and defined public policy" of Iowa. *Lara v. Thomas,* 512 N.W.2d 777, 782 (Iowa 1994).

■ We need not decide whether any public policy was violated in this case because Phipps offered insufficient proof that Blue Cross retaliated against him for making an inquiry under the Iowa Wage Payment Collection Law. Other than the fact that he was terminated approximately one month after he filed his grievance, Phipps has failed to produce sufficient evidence that he was fired because he questioned the sixty-day probation. Phipps even conceded that there is no evidence to support his retaliation claim other than the fact that the termination followed the filing of the grievance. This evidence, without more, is insufficient to generate a jury question on retaliation. *See Hulme v. Barrett,* 480 N.W.2d 40, 43 (Iowa 1992) (relying on *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1314 (6th Cir.1989) ("[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim.")). The record reflects that Phipps was discharged because of his unacceptable performance and repeated disciplinary problems.

### V. *Handbook Exception to Employment At–Will.*

Phipps next argues that he has a valid breach of contract claim because Blue Cross did not follow its step discipline procedures, violating its own course of conduct and written policies. This is a claim under the second exception to the employment at-will doctrine. We hold that no employment contract existed between Phipps and Blue Cross.

■ We have recently examined the question of whether an employee handbook constitutes an enforceable contract. In *Anderson,* we summarized the proper approach to the question:

When considering whether a handbook creates a contract we utilize unilateral contract theory. A unilateral contract consists of an offeror making a promise and an offeree rendering some performance as acceptance. An employee handbook is a unilateral contract when three elements are present: (1) the handbook is sufficiently definite in its terms to create an *offer;* (2) the handbook is communicated to and accepted by the employee so as to constitute *acceptance;* and (3) the employee provides *consideration.*

As with any contract, the party who seeks recovery on the basis of a unilateral contract has the burden to prove the existence of a contract.

*Anderson,* 540 N.W.2d at 283 (citations omitted). As *Anderson* makes clear, Phipps has the burden to prove that Blue Cross's handbook and manual created an enforceable contract.

■ The first step is to consider whether the handbook and manual constituted an offer by Blue Cross to use step discipline procedures. This analysis is conducted according to traditional contract theory. *Id.* at 285. An offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it." *Id.* (quoting Restatement (Second) of Contracts § 24 (1981)). We look for the existence of an offer objectively, not subjectively. *Id.*

■ In conducting our objective inquiry, we look for terms with precise meaning that provide certainty of performance. *Id.* at 286. If an offer is indefinite, there is no intent to be bound. *Id.* Therefore, to decide how a reasonable employee would construe Blue Cross's handbook and manual, we must decide whether the text was *sufficiently definite* to constitute an offer to apply "step discipline" procedures. That is a question of law. *Id.* Several factors, which we articulated in *Anderson,* guide our fact-intensive inquiry into whether a contract was created:

(1) [Are] the handbook [and manual] in general, and the [step discipline] procedures in particular, mere guidelines or a

statement of policy, or are they directives? (2) Is the language of the disciplinary procedures detailed and definite or general and vague? and (3) Does the employer have the power to alter the procedures at will or are they invariable?

*Id.* (citations omitted). These questions help determine whether an employee is reasonably justified in understanding a commitment has been made. *Id.* at 287.

In the manual, the step discipline procedures are introduced with the following language:

> The following steps are available to management and may be followed as deemed appropriate depending upon the nature of the infraction or the severity of the performance problem and the needs of the Plan. Nothing contained herein is intended to effect the at will status of the employment relationship.

Further, on the first page of the manual, it states:

> These guidelines will be revised from time to time as management deems necessary and appropriate and may be revised at any time without notice.

In addition to those factors, we must also consider Blue Cross's disclaimers. A disclaimer can prevent the formation of a contract by clarifying the employer's intent not to make an offer. *Anderson,* 540 N.W.2d at 287. In *Anderson,* we stated that "[i]n the context of employee handbooks, the essential purpose of a disclaimer is to claim at-will status for the employment relationship by repudiating or denying liability for statements expressed in the handbook." *Id.* (quoting Stephen F. Befort, *Employee Handbooks & the Legal Effect of Disclaimers,* 13 Indus. Rel. L.J. 326, 349 (1991/1992)).

With disclaimers, we look at two main factors: (1) whether the disclaimer is clear in its terms; and (2) whether the coverage of the disclaimer is unambiguous. *Id.* at 288. Here, both the handbook and the manual contained prominent, unambiguous disclaimers. In the handbook, there is at least one disclaimer stating that the handbook is not intended to create any contractual relationship and that employees are at-will. In the manual, there are at least four disclaimers similar to the handbook's. We believe these clearly state Blue Cross's intention not to create an employment contract. Also, the coverage of the disclaimers is very clear. They unequivocally apply to the entire handbook and the entire manual. As a matter of law, no employment contract existed between Phipps and Blue Cross.

### VI. *Breach of Good Faith and Fair Dealing.*

Phipps next urges us to recognize a claim for breach of good faith and fair dealing, claiming that, as an employer, Blue Cross is expected to follow its policies in good faith. In Iowa, the tort of breach of implied covenant of good faith and fair dealing has never been recognized in the employment context. *Grahek v. Voluntary Hosp. Coop. Ass'n,* 473 N.W.2d 31, 34 (Iowa 1991). In recent years, we have continued to reject the doctrine. *See Huegerich,* 547 N.W.2d at 220; *Anderson,* 540 N.W.2d at 282; *French v. Foods, Inc.,* 495 N.W.2d 768, 771 (Iowa 1993). We see no reason to reconsider our position.

### VII. *Conclusion.*

Because there was no breach of contract, we need not address Phipps' claim for mental anguish resulting from the breach. We hold that the district court did not err in granting summary judgment in favor of Blue Cross. We affirm.

**AFFIRMED.**