**IN THE COURT OF APPEALS OF IOWA**

No. 13-1446
Filed February 11, 2015

**CHAD MICHAEL PHARAOH-CARLSON,**
     Plaintiff-Appellant,

**vs.**

**HY-VEE, INC.,**
     Defendant-Appellee.
_____

     Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.


     Chad Michael Pharaoh-Carlson appeals the district court's denial of his motion for new trial and motion for judgment notwithstanding the verdict. **AFFIRMED.**


     Thomas Newkirk and Alyssa Snyder of Newkirk Zwagerman Law Firm, P.L.C., Des Moines, for appellant.

     Kermit B. Anderson of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellee.


     Heard by Mullins, P.J., and Bower and McDonald, JJ. Danilson, C.J., takes no part.

**BOWER, J.**

Chad Michael Pharaoh-Carlson (Carlson) appeals the district court's denial of his motion for a new trial and judgment notwithstanding the verdict (JNOV). Carlson claims the district court erred by including language in jury instruction 12 misstating the law regarding the workers' compensation public-policy exception to Iowa's "at-will" employment doctrine, and the court erred in failing to instruct the jury on other relevant legal principles. We find Carlson failed to preserve error on his claims and affirm the district court's ruling.

## I.  BACKGROUND FACTS AND PROCEEDINGS

Carlson first began working part-time for Hy-Vee in 2006. After working a mixture of part-time and full-time positions at several central Iowa Hy-Vee locations, Carlson transferred to the Boone Hy-Vee in August 2009. In December, Carlson was promoted to manager of the Health and Beauty Care Department (HBC). As the HBC manager, Carlson was responsible for the entire department, which included ordering, stocking, and inventorying all merchandise. He was the only employee assigned to the department.

The Boone Hy-Vee's upper management consisted of store director, Mark Halbmaier; manager of store operations, Greg Rottinghaus; and manager of perishables, Jeramie Guy. Halbmaier was the highest ranking management authority at the Boone store and was responsible for all business operations. Rottinghaus oversaw the HBC department, among others, and was Carlson's direct supervisor. Guy had general supervisory authority over all department heads, including Carlson.

In June 2010, Carlson noticed his ankle would periodically become "tight." He initially ignored the pain, but Carlson said the pain worsened to the point where it was difficult for him to walk. On July 5, Carlson called Guy and stated his foot hurt and he could not walk. Guy told him to see a doctor to "get it looked at." Carlson called again the next day and stated his foot still hurt and he had been unable to see a doctor. On July 7, Carlson visited a clinic and was seen by a physician's assistant. After Carlson reported his ankle injury might be work related, the physician's assistant recommended Carlson see Hy-Vee's workers' compensation physician.

On July 9, Carlson was seen by Hy-Vee's workers' compensation provider Dr. Joel VanderMeide at the Boone Family Practice Clinic. VanderMeide's office notes indicate Carlson was diagnosed with a "moderate case of Achilles tendonitis." "In order to keep [Carlson] working," VanderMeide prescribed pain medication and a "CAM walker" to immobilize Carlson's ankle. VanderMeide prepared a note for Hy-Vee verifying he had seen Carlson. The note states: Carlson should wear the immobilizer at all times, avoid climbing ladders or stairs repeatedly, and should not kneel or squat on his ankle. VanderMeide requested a follow-up appointment with Carlson in one week.

When Carlson returned to work on July 12, Rottinghaus and Guy spoke with him about the amount of work he had been missing and the declining state of his department. Rottinghaus prepared a memorandum[1] of the conversation:

---

[1] Carlson testified the memorandum was a correct statement of the discussion that day.

Today Jeramie Guy and I talked to Michael P.C. about his attendance as of late. Michael has been missing a lot of his shifts due to health issues. I told Michael that this was a concern because of his status as a department manager at the store. I explained to Michael that his department is falling behind due to the lack of attention he is giving. I asked him if he foresees any issues with missing work and he said "no." I told him that I can understand if he is having health issues but he needs to visit the doctor and get things resolved. I also told Michael that he is 3 months behind in regards to counting his department. He was well aware of this and assured he would have his department counted and verified by the end of the quarter. Again I told Michael that he needs to be here in order to be a department head. I asked him one final time if he is able to do his job. Michael told me "yes" he can do his job and there will be nothing to worry about.

Both Rottinghaus and Guy testified at trial that Carlson had not mentioned anything about job functions he could not perform nor did he ask for help with any of his job functions. Rottinghaus testified he did not receive the note prepared by VanderMeide. Rottinghaus stated if he had received the release or been made aware of Carlson's impairment, he would have provided accommodations to Carlson as he had done for other employees in the past.

Carlson worked his scheduled shifts on July 13, 15, and 17. Carlson also worked on July 19, but left partway through his shift, with permission from Rottinghaus, to allegedly care for his spouse who was threatening suicide. Carlson was scheduled to work on the 20th, but called Rottinghaus reporting he was still caring for his spouse and would not be at work. The same day another employee told Rottinghaus and Guy that Carlson's reason for leaving work was untrue. The employee testified at trial Carlson told her his spouse had not threatened suicide, and Carlson stated he just wanted to go home and did not

want to work. The Hy-Vee management did not make an official record of the employee's statement concerning Carlson.

Carlson worked his scheduled shifts on July 22, 23, and 24. On July 26, Carlson called Guy and stated he could not work the shift because he could not walk. On July 27, Carlson gave Rottinghaus a note from VanderMeide stating he needed to be off work until August 6. After meeting with Carlson, Rottinghaus made the following note about their conversation:

> Today Michael P.C. came in with a doctor's note explaining that he needed to be off until 8-6-10. At that time I noticed that he had an odor of liquor about him. I told him that is fine but I reminded him that his department is still steadily declining. I asked him if he remembered our conversation about getting his department counted and maintained on time. He said he would have everything done in a timely fashion. I told him that when he comes back on the 8th we will sit down and discuss what his plans are for the future.

Rottinghaus informed Halbmaier of his conversation with Carlson. Halbmaier suggested that VanderMeide be contacted to determine if there was any work Carlson could perform in his condition. This was Halbmaier's customary approach in such situations. Rottinghaus then contacted Hy-Vee's claim's handler, EMC Risk Services, and asked them to contact VanderMeide's office for a reevaluation of Carlson. On July 30, Carlson returned to VanderMeide for a follow-up appointment. VanderMeide's office note from the appointment states:

> There apparently was some disagreement over what exactly his work duties should be. I had written a letter for him originally stating what his restrictions were but he says they were not following them. At that point I wrote a letter that said he should be off work until he follows up with me. I then received a call from his employer and they stated that since he is a manager he can do a

sedentary job and that no one is making him do anything that would hurt his ankle. So he now needs more specific restrictions given.

VanderMeide wrote Carlson another letter to give to Hy-Vee releasing him for work and outlining specific work restrictions.[2] Essentially, VanderMeide limited Carlson to a "sedentary desk job until he [was] recovered." Rottinghaus did receive a copy of Carlson's work release letter.

Carlson was scheduled[3] to work on July 30 and 31. He did not report for work or contact the store either day. Carlson was scheduled to work on Monday August 2. He did not report to work as scheduled or contact the store to report his absence. After his scheduled shift on August 2, Carlson went to the store and asked to speak with Rottinghaus. Upon learning Carlson was in the store, Rottinghaus conferenced with Guy and Halbmaier on how to proceed with Carlson's employment. After discussing Carlson's multiple "no call/no shows," Halbmaier made the final decision to terminate Carlson's employment with Hy-Vee. Guy and Rottinghaus then informed Carlson his employment at Hy-Vee was terminated.

On July 17, 2011, Carlson filed a petition in the district court alleging his employment with Hy-Vee was terminated due to his pursuit of workers'

---

[2] VanderMeide's restrictions stated:
> I want him to continue using the boot as well as the night splint when he sleeps. He is to continue going to physical therapy. I wrote him another letter for his employer today which outlines his specific restrictions. I do not want him to walk or stand for a prolonged amount of time. I do not want him to do any repetitive kneeling or squatting. I don't want him to lift more than 15 pounds. I am recommending that he do a sedentary desk job until he is recovered. He is to follow up with me in another 2 weeks.

[3] The schedule for the week starting with Monday July 26 was posted in the store for employees to view on Monday July 19.

compensation rights and claiming Hy-Vee's termination of his employment was in violation of the Iowa public-policy exception to at-will employment. On November 16, 2012, Hy-Vee moved for summary judgment claiming there was insufficient evidence to link Carlson's pursuit of workers' compensation rights to the termination of his employment. Hy-Vee's motion was denied and a jury trial commenced on June 10, 2013. The jury returned a verdict finding Carlson had failed to prove all the propositions of his claim for retaliatory discharge against Hy-Vee. Based on the jury verdict, the district court entered judgment in favor of Hy-Vee.

On June 28, Carlson filed a motion for new trial and motion for JNOV. Carlson claimed the court erred when it refused to submit his proposed jury instruction defining the rights granted by the Iowa workers' compensation law and instead submitted jury instruction 12, which stated it, is not against public policy "to discharge an injured employee for non-retaliatory reasons, such as absenteeism or poor job performance." The court denied Carlson's post-trial motions. Carlson appeals from the district court's denial.

## II.    STANDARDS OF REVIEW

We review a district court's decision to deny a motion for judgment notwithstanding the verdict for errors at law. *Lee v. State*, *Polk Cnty. Clerk of Court*, 815 N.W.2d 731, 736 (Iowa 2012). In reviewing the court's decision, we must determine whether sufficient evidence existed to justify submitting the case to the jury at the conclusion of the trial. *Id.* We view the evidence in the light most favorable to the nonmoving party. *Id.*

"The scope of our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001). "'To the extent the motion is based on a discretionary ground, we review it for an abuse of discretion. But if the motion is based on a legal question, our review is on error.'" *Id.* (quoting *Roling v. Daily*, 596 N.W.2d 72, 76 (Iowa 1999)). In this case, Carlson claims the district court erred in its instruction of the jury. "We review alleged errors in jury instructions for correction of errors at law." *Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006).

## III. ERROR PRESERVATION

Hy-Vee claims Carlson has failed to preserve error on his jury instruction challenge. Carlson claims he properly preserved error, and he claims instruction 12, as submitted to the jury, contained prejudicial errors. Our supreme court has outlined the rules for error preservation on objections to jury instructions:

> Even a timely objection to jury instructions will not avoid waiver of error if the objection is not sufficiently specific. The objecting party must "specify [ ] the matter objected to and on what grounds." Iowa R. Civ. P. 1.924. The objection must be "'sufficiently specific to alert the trial court to the basis of the complaint so that if error does exist the court may correct it before placing the case in the hands of the jury.'" *Boham v. City of Sioux City*, 567 N.W.2d 431, 438 (Iowa 1997) (quoting *Moser v. Stallings*, 387 N.W.2d 599, 604 (Iowa 1986)).

*Olson v. Sumpter*, 728 N.W.2d 844, 848–49 (Iowa 2007).

Based on our review, the record shows a discrepancy between Carlson's objections to the jury instructions at trial and his claims on appeal. We find Carlson has failed to preserve error on his claims. At trial, Carlson objected to

the use of certain language and proposed other language be used in instruction 12. The court and Hy-Vee's counsel agreed with Carlson's proposed changes. The court then changed the language in instruction 12 to reflect Carlson's request. On appeal, Carlson claims the entire third paragraph of instruction 12 is prejudicial. He claims the instruction is a misstatement of the law, directly conflicts with the entire purpose of the public-policy exception, and gave him no chance of prevailing at trial. Carlson's objection at trial was not "sufficiently specific" to alert the court and opposing counsel to the claims he now raises on appeal. *See* Iowa R. Civ. P. 1.924; *Sumpter*, 728 N.W.2d at 848–49. Carlson's post-trial motions were insufficient to preserve error on his claims since "error in jury instructions is waived if not raised before closing arguments are made to the jury." *Id.* Therefore, we agree with Hy-Vee and find Carlson has failed to preserve error for his claims in this appeal. Even though we have found error was not preserved we will address Carlson's claims on the merits.

## IV. JURY INSTRUCTION

Carlson claims the district court erred by including language in jury instruction 12 misstating the law regarding the workers' compensation public-policy exception to Iowa's "at-will" employment doctrine, and the court erred in failing to instruct the jury on other relevant legal principles. Hy-Vee claims instruction 12 did not misstate the law, and the court properly instructed the jury. Instruction 12, as submitted to the jury, stated:

> Mr. Carlson was an employee at will. An employee at will may be terminated at any time for any reason, except if it is contrary to the public policy of this state.

> It is against the public policy of this state to discharge any employee for pursing the rights afforded under the Iowa Workers' Compensation statute.
>
> It is not against the public policy of this state to discharge an injured employee for non-retaliatory reasons, such as absenteeism or job performance. Mr. Carlson has the burden of proving that Hy-Vee's reasons for discharge were retaliatory.

Carlson claims there are several errors in this instruction. First, the instruction placed no restrictions whatsoever on what type of absences or performance issues that could justify termination. Second, the instruction conflicts with the purpose of the workers' compensation public-policy exception to the at-will employment doctrine because it tasked Carlson with proving his case and also carrying the burden of disproving Hy-Vee's (what he claims were) affirmative defenses.

Our supreme court recently restated Iowa's at-will employment doctrine, and the public policy exception, in *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*:

> Employment in Iowa is at will. *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011). Therefore, unless the employee has a valid contract of employment, "the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.'" *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)). Yet, the employer's right to discharge an employee under an at-will employment contract may be limited by public policy considerations. *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998).
>
> Iowa follows the majority of states by carving out a public-policy exception to the general rule of at-will employment for wrongful-discharge claims. *See Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988) (adopting the public-policy exception in Iowa).
>
> Public policy is an elusive legal construct. We have previously said public policy is that which "'generally captures the communal conscience and common sense of our state in matters of

public health, safety, morals, and general welfare.'" *Berry*, 803 N.W.2d at 110 (quoting *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009)). Another definition includes those matters "fundamental to citizens' social rights, duties, and responsibilities." *Id.* Once identified, the public policy "becomes a benchmark in the application of our legal principles." *Jasper*, 764 N.W.2d at 761.

An employee seeking protection under the public-policy exception in his or her wrongful-discharge claim must prove the following elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Berry*, 803 N.W.2d at 109–10. The first two elements constitute questions of law to be determined by the court. *Fitzgerald*, 613 N.W.2d at 282. If the discharged employee successfully establishes each of these elements, "he or she is entitled to recover both personal injury and property damage." *Berry*, 803 N.W.2d at 110.

835 N.W.2d 293, 300 (Iowa 2013).

The filing, or intended filing, of a workers' compensation claim by an employee constitutes a protected activity. *Springer v. Weeks and Leo Co., Inc.*, 429 N.W.2d 558, 561 (Iowa 1988); *Graves v. O'Hara*, 576 N.W.2d 625, 628 (Iowa Ct. App. 1998). "A theory of recovery premised on termination for pursuing a workers' compensation claim has been distinguished from a wrongful termination claim based on absenteeism occasioned by a work-related injury." *Weinzetl v. Ruan Single Source Transp. Co.*, 587 N.W.2d 809, 811-12 (Iowa Ct. App. 1998) (referencing *Yockey v. State*, 540 N.W.2d 418, 421 (Iowa 1995) and *Graves*, 576 N.W.2d at 629).

In the present case, we find jury instruction 12 did not misstate the workers' compensation public-policy exception to Iowa's at-will employment law doctrine. Instruction 12 is a proper statement that absenteeism, attributable to a work-related injury, can be a valid reason to terminate employment. The record supports the finding Carlson's discharge was premised on his three "no call/no shows" and poor work performance, rather than for pursuing workers' compensation. Instruction 12 informs the jury an employee's termination for pursing a workers' compensation claim is a violation of Iowa public policy. Pursuant to its verdict, the jury found Carlson was not terminated for pursuing a workers' compensation claim. Therefore, we find Carlson was not prejudiced by instruction 12, and the district court did not err in submitting instruction 12 to the jury.

**AFFIRMED.**